1    ISMAIL J. RAMSEY (CABN 189820)
     United States Attorney
2

3    THOMAS A. COLTHURST (CABN 99493)
     Chief, Criminal Division

4    JONATHAN U. LEE (CABN 148792)
     Assistant United States Attorney
5

6       450 Golden Gate Avenue, Ninth Floor
       San Francisco, California 94102
7       Telephone: (415) 436-7210
       Jonathan.Lee@usdoj.gov

8    Attorneys for United States of America

9             UNITED STATES DISTRICT COURT

10         NORTHERN DISTRICT OF CALIFORNIA

11               OAKLAND DIVISION

12

13    UNITED STATES OF AMERICA,      )    CASE NO. CR 23-060 HSG
                               )
14         Plaintiff,            )    **OPPOSITION TO MOTION TO SUPPRESS**
                               )
15      v.                     )
                               )
16    ANTOINE FORD,               )
                               )
17         Defendant.         )
                               )
18                                )
                               )
19                                )
20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION
CR 23-060 HSG

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................2

       A.     September 24 shooting and initial investigative steps ................................2

       B.     The search for the unidentified man involved in the shooting......................3

       C.     The efforts to find Mr. Ford to execute the arrest warrant..........................4

       D.     The November 17, 2022 arrest and search warrant execution.......................7

       E.     The November 17, 2022 interview of Mr. Ford............................................7

       F.     Federal arrest ...........................................................................................7

       G.     February 21, 2023 interview .......................................................................8

       H.     T-Mobile search warrant ............................................................................8

       I.     Current Charges ........................................................................................9

       J.     Criminal History ........................................................................................9

       K.     Gang membership .....................................................................................9

III.   ARGUMENT ........................................................................................................9

       A.     Probable cause supported the issuance of the arrest warrant.......................9

       B.     Probable cause supported the issuance of the four search warrants ............15

       C.     The officers relied on the warrants in good faith.......................................24

       D.     During the two post-arrest interviews discussed in the motion, Mr. Ford made
              admissions before he said he had nothing more to say....................................24

       E.     Defendant is not entitled to an evidentiary hearing ..................................25

IV.    CONCLUSION....................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3
*Adams v. Williams*, 407 U.S. 143 (1972) ................................................................. 22

4
*Davis v. United States*, 564 U.S. 229 (2011) ........................................................... 24

5
*District of Columbia v. Wesby*, 583 U.S. 48, 138 S. Ct. 577 (2018) .................................. *passim*

*Franks v. Delaware*, 438 U.S. 54 (1978) ............................................................. 17, 18

6
*Fuller v. Ndoh*, No. 17-cv-03196-YGR, 2018 WL 1174561 (N.D. Cal. Mar. 6, 2018) ...................... 19

7
*Grant v. City of Long Beach*, 315 F.3d 1081 (9th Cir. 2002) ........................................... 14

8
*Herring v. United States*, 555 U.S. 135 (2009) ........................................................ 24

9
*Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317 (1983) .............................................. *passim*

*Illinois v. MacArthur*, 531 U.S. 326 (2001) ............................................................ 22

10
*Illinois v. Wardlow*, 538 U.S. 119, 120 S. Ct. 673 (2000) ......................................... 12, 19

11
*Kaley v. United States*, 571 U.S. 320, 134 S. Ct. 1090 (2014) .......................................... 9

12
*Massachusetts v. Sheppard*, 468 U.S. 981 (1984) ....................................................... 24

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) ................................................. 12, 19

13
*United States v. Ankeny*, 502 F.3d 829 (9th Cir. 2007) ................................................ 22

14
*United States v. Artis*, 919 F.3d 1123 (9th Cir. 2019) ................................................ 14

15
*United States v. Bailey*, 568 U.S. 186 (2013) ......................................................... 22

16
*United States v. Castillo*, 866 F.2d 1071 (9th Cir. 1988) ......................................... 10, 15

*United States v. Chavez–Miranda*, 306 F.3d 973 (9th Cir. 2002) .................................... 20, 21

17
*United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2004) ......................................... 21, 22

18
*United States v. Crews*, 502 F.3d 1130 (9th Cir. 2007) ........................................... 15, 20

19
*United States v. Flores*, 802 F.3d 1028 (9th Cir. 2015) .............................................. *passim*

*United States v. Fowlie*, 24 F.3d 1059 (9th Cir. 1994) ................................................ 18

20
*United States v. Garcia*, 974 F.3d 1071 (9th Cir. 2020) ............................................... 23

21
*United States v. Garcia-Cruz*, 978 F.2d 537 (9th Cir. 1992) ........................................... 18

22
*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) ...................................... 10, 14, 15

23
*United States v. Grandberry*, 730 F.3d 968 (9th Cir. 2013) ............................................ 21

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) ................................................ 25

24
*United States v. Hylton*, 30 F.4th 842 (9th Cir. 2022) ................................................ 23

25
*United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985) ............................................. 18

26
*United States v. Johnson*, No. CR 19-0139 WHA, 2019 WL 6251282 (N.D. Cal. Nov. 22, 2019) ........ 14

*United States v. Leon*, 468 U.S. 897 (1984) ........................................................... 24

27
*United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007) ............................................. 9, 14

28
*United States v. Mackey*, 431 F. App'x 594 (9th Cir. 2011) ............................................ 21

*United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990) ........................................ 24
*United States v. Meek*, 366 F.3d 705 (9th Cir. 2004) ............................................... 18
*United States v. Otero*, 563 F.3d 1127 (10th Cir. 2009) .......................................... 24
*United States v. Paopao*, 469 F.3d 760 (9th Cir. 2006) ........................................... 21
*United States v. Peoples*, No. 19-CR-00226-RS-13, 2023 WL 5279650 (N.D. Cal. Aug. 16, 2023) ..... 22
*United States v. Perkins*, 850 F.3d 1109 (9th Cir. 2017) ................................... 17, 19
*United States v. Pitts*, 6 F.3d 1366 (9th Cir. 1993) ................................................ 21
*United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000) ........................................... 17
*United States v. Ruckes*, 586 F.3d 713 (9th Cir. 2009) ............................................ 23
*United States v. Solorio-Mendoza*, 731 F. App'x 583 (9th Cir. 2018) ......................... 25
*United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985)........................................ 10, 17
*United States v. Tham*, 960 F.2d 1391 (9th Cir. 1992) ............................................ 18
*United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013) ..................................... 16
*United States v. Wilkins*, 538 F. Supp. 3d 49 (D.D.C. 2021) .................................... 15
*United States v. $92,422.57*, 307 F.3d 137, 152 (3d Cir. 2002.................................. 24
*Whiteley v. Warden*, Wyo. State Penitentiary, 401 U.S. 560 (1971) ......................... 13, 14

**Statutes**

18 U.S.C. section 922(g)............................................................................................. 7

**Penal Codes**

Penal Code section 245 ........................................................................................... 11
Penal Code section 12021 ....................................................................................... 11
Penal Code section 29800 ....................................................................................... 11

1

## I.   **<u>INTRODUCTION</u>**

2      The totality of the circumstances showed that Antoine Ford fired his Glock handgun at another

3  male on September 24, 2022, in a shooting in broad daylight that left two men wounded, one of whom

4  later died.  Nearby security video cameras captured the shooting.  At a local hospital, security video

5  showed Mr. Ford bringing one of the wounded men for treatment.  Multiple people identified Mr. Ford

6  from the hospital video, and the lead homicide investigator identified him as the same person shown in

7  the crime scene video.  The lead investigator sought an arrest warrant for Mr. Ford.  Given Mr. Ford's

8  known membership in the Ghost Town criminal street gang, an Oakland Police Department officer with

9  experience investigating Ghost Town sought search warrants to find Mr. Ford.  The first search warrant

10 sought Mr. Ford's Instagram account information.  Based on his use of a phone number on Instagram,

11 the second warrant sought his phone number account information.  Based on the location data for this

12 same phone number as well as confirmation that Mr. Ford was co-head of household at an Oakland

13 residence, the third warrant sought to search the residence for the firearm used in the September 24

14 shooting.  Relying on the warrants in good faith, Oakland Police Department officers searched the

15 Instagram and phone accounts and later searched the apartment, where the located the Glock firearm

16 used by Mr. Ford on September 24.  When ballistics showed the firearm was used in a March 2022

17 shooting, federal investigators sought a federal search warrant for the phone account information.

18      In his pending motion to suppress, Mr. Ford tries to invalidate the arrest warrant and the

19 following search warrants by critiquing particular facts in isolation.  This is a divide-and-conquer

20 approach that is inconsistent with the proper totality-of-the-circumstances standard, which considers all

21 of the facts as a composite whole.  His attempts to heighten the probable cause standard (by arguing, for

22 example, that certain facts don't conclusively prove he fired a handgun in the September 24 shooting

23 incident) similarly flout the proper standard and the "great deference" reviewing courts must give to the

24 issuing court's probable cause decision.  And none of Ford's arguments overcome the good faith

25 exception to the exclusionary rule that is an independent ground to dismiss his motion.  The Court

26 should deny the motion to suppress without an evidentiary hearing.

27

28

OPPOSITION TO MOTION
CR 23-060 HSG                                  1

## II.     STATEMENT OF FACTS

### A.     September 24 shooting and initial investigative steps

On September 24, 2022, at 7:03 a.m., Oakland Police Department officers responded to a ShotSpotter activation of four rounds fired near the 3200 block of Market Street in Oakland.  Hansen Dec., Ex. B (USA-000283)[1].  As officers were en route, two men appeared at a nearby hospital with gunshot wounds.  *Id*.  At 7:16 a.m., a Mr. Bassette Hairston (Hairston) walked into Alameda County Hospital with two gunshot wounds to the abdomen.  *Id*.  At 7:18 a.m., a man identified as Charles Wright arrived at Summit Hospital with five gunshot wounds.  *Id*. at 283, 300.  After his later transfer to County Hospital, Mr. Wright died at 9:13 a.m.  *Id*. at 283.

Mr. Hairston said he was involved in a shooting two blocks away and near his vehicle.  *Id*. at 301.  Officers located his vehicle, still running with the key in the ignition and unlocked doors, but no evidence of a shooting incident such as strike marks or blood stains.  *Id*.  Officers canvassed the surrounding area, and nearby at 936 Brockhurst Street, officers located a dark green Buick and found spent shell casings near the driver side front door (three 45 caliber casings) and on the ground at the vehicle's rear (one 40 caliber casing).  *Id*. at 283.

Officers contacted Summit Hospital personnel and learned from a security guard that an unidentified male brought Mr. Wright inside the hospital after parking a vehicle and running inside to retrieve a wheelchair.  *Id*. at 284.  Officers recovered the hospital security video showing Mr. Wright's arrival.  *Id*.  Officers recovered the hospital security video at 7:41 a.m. that morning.  *Id*. at 323.

Meanwhile, officers at the Brockhurst Street location canvassed that block and the surrounding areas on Market and San Pablo for witnesses and video.  *Id*. at 285.  Officers were able to recover video from St. Mary's Center at 925 Brockhurst and viewed the video on scene.  *Id*.

Two civilians approached officers at the Brockhurst scene with information about Mr. Wright.  Claiming to be his aunt, D.W. stated she came from Vallejo because she had been told two people were shot.  *Id*. at 295.  With her was a male, R.H.  *Id*.

---

[1] All references to pages in the Hansen Declaration exhibits are to documents numbered using the "USA-000###" convention.

**B.** <u>**The search for the unidentified man involved in the shooting**</u>

Within a short time, investigators determined that Mr. Hairston and Mr. Wright were involved in a shooting in front of 925 Brockhurst. Detective Baker arrived at the crime scene that same morning. Hansen Ex. A (5594). His affidavit describes his investigation from that point.

In substance, Baker described the circumstances of the shooting at 7:03 a.m., the location of the scene itself, and the identification of two calibers of spent casings near a green Buick parked on Brockhurst. *Id*. His affidavit confirmed that D.W and R.H. informed officers at the scene that the Buick was Mr. Wright's. *Id*.

Baker described the video that captured the shooting, and stated that on an initial review, the video appeared to show that Mr. Hairston shot Mr. Wright and Mr. Wright may have shot Mr. Hairston. *Id*. His affidavit included additional information:

> After downloading and reviewing the video footage from 925 Brockhurst, it appears that Bassette-Hairston and Wright were involved in a conversation while standing on the north sidewalk, Wright walks out into the street near the driver side of the [green Buick] at which time Bassette-Hairston follows him, produces a firearm and shoots Wright. Wright attempted to flee on foot. Bassette-Hairston continued shooting Wright.

> At the time of the shooting, an unknown male was sitting in the driver seat of an Infinity sedan parked directly behind the Buick. The unknown male opens the door of the Inifinity and shoots Bassette-Hairston who then flees on foot towards San Pablo Ave. The unknown male gets out of the Infinity briefly and then re-enters the Infinity. Wright enters the passenger seat of the Infinity and the unknown male drives Wright from the scene traveling west on Brockhurst Street.

> I later reviewed video surveillance footage from Summit Hospital, which shows Wright being dropped off. The unknown male that shot Bassette-Hairston is the same person the drove Wright to Summit Hospital. (*Id*. at 5595)

Using OPD email, at 7:16 p.m., Detective Baker sent images from the hospital surveillance video showing the unidentified male who drove Mr. Wright to Summit Hospital in an attempt to identify him. *Id*. He received two positive responses from OPD officers that night and one the next day:

- At 8:35 p.m., Lt. McGiffert stated the male appeared to be Antoine Ford. *Id*.

- At 9:39 p.m., Officer Yamashita advised the male was Ghost Town gang member Antoine Ford.

1    Officer Yamashita sent a follow up email that included a booking photo of Mr. Ford.  *Id.*

2    • On September 25, 2022 at 3:27 p.m., Sgt. Perea identified the male as Antoine Ford.  Perea

3      stated he had numerous contacts with Mr. Ford on two assignments, and he advised that Ford

4      could be found at a location on Brockhurst near Martin Luther King, Jr. Way (a location two

5      blocks east).  *Id.* at 5596.

6    The affidavit also described the continuing contacts with R.H. and his family in Vallejo.  When

7    Det. Baker showed seven images, including a DMV photo of Mr. Ford and three images from the

8    hospital video showing Mr. Ford and Mr. Wright, R.H. recognized the individual in the booking photo

9    who he described as having a limp, but he could not remember his name; he was unsure about two of the

10   hospital video images and stated he did not recognize either his nephew or Mr. Ford in the final image.

11   *Id.* at 5595.  R.H. was able to rule out another individual, T.J., from a review of his booking photo.  *Id.*

12   The affidavit stated that "[t]he still images from the surveillance footage had a blue tint to the photos due

13   to technical issues."  *Id.*  After obtaining the true hospital video on September 26 (the prior images

14   described above were from a cell phone recording of the video), Det. Baker showed the images to R.H.,

15   who confirmed the person used the street moniker of "Fuzzy."  *Id.* at 5596.  Det. Baker knew that Mr.

16   Ford uses "Fuzzy" as his street moniker.  *Id.*  He also reviewed the true video images from the hospital

17   and Mr. Ford's booking and DMV photos to determine he was the individual in the hospital video.  *Id.*

18   The affidavit disclosed Mr. Ford's sex, race, height, weight, hair and eye color, and criminal

19   history identifiers (PFN and CII), and it disclosed four of Mr. Ford's previous felony convictions.  *Id.*

20   Based on the identification of Mr. Ford made by three OPD officers and R.H., Det. Baker sought

21   the arrest warrant for two charges – assault with a deadly weapon and felon in possession of a firearm –

22   for shooting Mr. Hairston.  *Id.* at 5592.  Det. Baker signed the arrest warrant application on September

23   27, 2022, three days after the shooting.  *Id.*  Alameda County Superior Court Judge McGlaughlin signed

24   the arrest warrant that same day.  Hansen Ex. A (5583).

25   **C.    The efforts to find Mr. Ford to execute the arrest warrant**

26        **1.    The Instagram search warrant**

27   On October 29, 2022, Oakland Police Officer Schmarzo submitted a search warrant application

28

1  for Mr. Ford's Instagram account.  Hansen Ex. D.  Officer Schmarzo determined the account was Mr.

2  Ford's because his account icon and Mr. Ford's street moniker.  The icon showed a photograph of Mr.

3  Ford. [2]  Mr. Ford's moniker of "Fuzzy" was also known to officers.  Officer Schmarzo's affidavit related

4  these facts:  1) Officer Schmarzo spoke to Det. Baker on October 23, 2022 about the September 24

5  shooting on Brockhurst, 2) he learned from Det. Baker that Mr. Ford "was identified as one of the

6  involved parties" in the shooting, 3) Det. Baker informed him there was an active arrest warrant for Mr.

7  Ford based on his involvement in the shooting, 4) Officer Schmarzo conducted a criminal records

8  database check (CLETS) and confirmed the active arrest warrant for assault with a deadly weapon and

9  felon in possession of a firearm, 5) Mr. Ford maintained an Instagram account using the moniker

10  "fuzzy.31", 6) "[t]he icon for the account is of Ford," and 7) Mr. Ford's street nickname is "Fuzzy."  *Id*.

11  at 5070.  The warrant sought, among other things, user content for the previous sixty days and pen

12  register and trap and trace information for the following thirty days.  *Id*. at 5075.  Judge Murphy signed

13  the warrant on October 30, 2022.  *Id*. at 577.

14                          **2.      The T-Mobile search warrant**

15       On November 3, 2022, Officer Schmarzo submitted a search warrant application for Mr. Ford's

16  T-Mobile phone account.  Hansen Ex. E.  The factual information described by Officer Schmarzo

17  restated much of the facts used in the Instagram warrant with some notable additions.  First, Officer

18  Schmarzo described his review on November 2, 2022 of the Instagram account data provided in

19  response to the warrant.  *Id*. at 5588.  Second, Officer Schmarzo stated that in reviewing the data he

20  noted that "[Mr.] Ford provided his phone number as 510-401-4435."[3]  *Id*.  Third, he related in the

21  affidavit that a database check showed the number belonged to T-Mobile and was registered in the name

22  "Antoine King" which was the same name Mr. Ford used in his Instagram account.  *Id*.

23       Officer Scharmzo requested historical records for the prior sixty days, including call detail and

24  location records, and pen register information for the following thirty days.  *Id*. at 339-340.  Judge

25  Reardon signed the search warrant the same day.  *Id*. at 342.

26  _____

27       [2] The account icon remains Mr. Ford's photo.  Schmarzo Dec. ¶ 11.

28       [3] An example of this is his message on October 12, 2022.  Schmarzo Dec. ¶ 13.

### 3.   The residential search warrant

On November 17, 2022, Officer Schmarzo submitted a search warrant application for Mr. Ford's residence and a vehicle Mr. Ford used.  Hansen Ex. H.  Officer Schmarzo stated that Mr. Hairston shot and killed Mr. Wright, and also that Mr. Ford was present and shot Mr. Hairston.  *Id*. at 250.  The affidavit erroneously stated that Mr. Ford drove Mr. Hairston to the hospital.  *Id*.  The affidavit described the clothing and shoes worn by Mr. Ford at the hospital.  *Id*.  It described the firearm used in the shooting as unrecovered.  *Id*.  The affidavit confirmed the active arrest warrant.  *Id*.

Officer Schmarzo then described the facts relating to the residence itself:  First, he asserted that he ran a query for potential addresses and noted an association between Mr. Ford and Ms. Freeman.  *Id*. at 251.  He stated he found an address on 29th Street in Oakland for Ms. Freeman.  *Id*.  Then, he described that Officer Quon with the Oakland Housing Authority (OHA) Police advised him of two facts.  First, that the residence in question was OHA property.  *Id*.  Second, that Mr. Ford was listed as co-head of household with Ms. Freeman for the unit in question.[4]  *Id*.  Officer Schmarzo also described the search warrant for Mr. Ford's cell phone location data and noted that the "pings" for Mr. Ford's phone "tend to 'overnight' (stay in a static location during night time hours when one is likely at home resting) in an area consistent with [the unit in question]."  *Id*.  Officer Schmarzo also described his observation on November 17, 2022 at approximately 7:00 p.m. of Mr. Ford leaving the residence and entering the driver's seat of the vehicle in question, moving the vehicle, and then reentering the residence.  *Id*.  Finally, the affidavit asserted Mr. Ford's status as a felon and that he is prohibited from possessing any firearms.  *Id*.

Officer Schmarzo drafted the supporting affidavit and submitted it for supervisor approval at 7:34 p.m.  Schmarzo Dec. ¶ 19.  He made no further substantive changes to it before he signed it at 7:56 p.m.  *Id*. ¶ 22.  Judge Clay signed the search warrant that night at 8:05 p.m.  Hansen Ex. H at 248.

---

[4] The discovery produced showing Mr. Ford was co-head of household is at Lee Dec. Exs. D, E; Schmarzo Dec. ¶ 16.

OPPOSITION TO MOTION
CR 23-060 HSG                                    6

**D.    The November 17, 2022 arrest and search warrant execution**

Officers called Mr. Ford and the other occupants out of the residence.[5]  Schmarzo Dec. ¶ 20.
Officers placed Mr. Ford under arrest just outside the front door of the residence.  *Id*.  Officers
performed a protective sweep of the apartment and its back yard to confirm whether other individuals
were present.  *Id*. ¶ 20.  Officers then remained inside the apartment with the other occupants until the
search warrant was approved.  *Id*. ¶ 23.  After the search warrant was signed by the judge, the officers
searched and found the loaded firearm in question in a box of clothing in a closet of an upstairs bedroom
at 8:36 p.m.  *Id*. ¶ 25.

**E.    The November 17, 2022 interview of Mr. Ford**

Mr. Ford was alone for the first thirty minutes.  When the interview started, he confirmed that the
residential unit searched that same day was his residence.  Lee Dec. Ex. G at 31:53.  Starting at 33:59,
investigators read Mr. Ford's rights to him.  After that, Mr. Ford spoke to officers for approximately
forty minutes before saying he had nothing to say at 1:12:58.  Mr. Ford made all of the following
Mirandized statements:  1) Mr. Ford admitted he was present at the Brockhurst shooting 37:20-39:10,
48:50-49:55; 2) he admitted Mr. Wright was his friend 34:48-35:15; and 3) he admitted that he assisted
Mr. Wright after the shooting by taking him to the hospital for treatment of his gunshot wounds.  36:05-
36:24, 36:35-50, 43:55-44:25.  Mr. Ford denied he fired a gun at the scene.  42:00-42:30.  Although he
denied being a shooter, when asked about the firearm found in his residence, Mr. Ford stated that he had
no firearms possession restriction because he had been out of prison for several years and he could
possess a firearm to defend himself.  57:30-58:15.  After Mr. Ford stated he had nothing to say about the
September 24 shooting, the interviewers asked him about a different homicide incident, and he answered
their questions and admitted he was present for that triple homicide, although he denied any culpability.

**F.    Federal arrest**

A federal grand jury returned an indictment of Mr. Ford for violation of 18 U.S.C. section 922(g)
on February 16, 2023.  Thereafter, federal agents conducted surveillance of Mr. Ford outside his

---

[5] The government agrees that when the officers called the occupants out, the search warrant had
not yet been approved.

OPPOSITION TO MOTION
CR 23-060 HSG                                      7

1    residence on 29th Street on February 21, 2023.  The FBI arrested Mr. Ford in the parking lot outside the

2    subject residence.  After agents handcuffed him, Mr. Ford said he was armed.  Agents removed a Cobra

3    Denali 380 from Mr. Ford's front right pocket; it was loaded with one round in the chamber and five in

4    the magazine.  Hansen Ex. L (4148).[6]

5           **G.     February 21, 2023 interview**

6           After his federal arrest, Mr. Ford was alone in the interview room for one hour.  Lee Dec. Ex. H.

7    The federal agent read him his rights, starting at 1:07:00.  At 1:12:30, Mr. Ford said he had nothing

8    more to say about "that" which appeared to be a reference to the firearm recovered from the search of

9    the subject residence in November 2022.  When agents asked Mr. Ford about the gun found on him that

10   day at the time of his arrest, he said he had the gun for his "protection", because people were trying to

11   kill him and citing his prior history of multiple gunshot wounds.  1:12:40-1:13:10.

12          **H.     T-Mobile search warrant**

13          On March 7, 2023, FBI Special Agent Chris Smith submitted a search warrant application for

14   Mr. Ford's T-Mobile phone account.  Hansen Ex. L.  Agent Smith also discussed the ballistics testing,

15   including microscopic comparisons, that tied the Glock recovered from Mr. Ford's residence to the

16   September 24 shooting and an earlier shooting on March 9, 2022 on Martin Luther King Jr. Way in

17   Oakland.  *Id*. at 4147-4148.  Agent Smith also described the security video depicting the September 24

18   shooting: "The video depicts FORD and two other men in a gun fight, with FORD firing from the

19   driver's seat of a parked vehicle.  The other two men involved in the shooting sustained gunshot

20   wounds; one of the men, Charles Wright, died later that day while receiving treatment for the gunshots

21   in the hospital.  Security video from the hospital depicts FORD retrieving a wheelchair from the hospital

22   to use to transport Wright, was injured in the gun fight." *Id*. at 4148.  Agent Smith also described the

23   federal indictment and arrest, and the search incident to the arrest, which revealed that Mr. Ford

24   possessed the Denali 380 handgun.  *Id*.  Agent Smith discussed two of Mr. Ford's prior felony

25   convictions, including his two prior firearms possession convictions, a 2006 conviction under state law

26

27          [6]At this time, pretrial release conditions in his state case prohibited Mr. Ford from possessing
     any firearms.  Lee Dec., Ex. C.

28
     OPPOSITION TO MOTION
     CR 23-060 HSG                                    8

and a federal conviction in 2008. *Id.* at USA-004149. Agent Smith requested phone company records including subscriber information, call detail records, and location information, for the period covered from the earlier March 2022 shooting incident confirmed by ballistics testing to the date of Mr. Ford's November 2022 arrest. *Id.* at Attachment B.

**I.       Current Charges**

Count one charges Mr. Ford with being a felon in possession of a firearm and ammunition during the period September 24, 2022 to November 17, 2022, relating to the Glock 27, .40 caliber handgun loaded with eight rounds of ammunition seized in the search of his residence. Count two charges Mr. Ford with possession of the loaded handgun seized at the time of his arrest from his person on February 21, 2023, namely a Cobra Denali .380 caliber with six rounds of ammunition. See Dkt. No. 13.

**J.       Criminal History**

Mr. Ford sustained approximately six felony convictions before the September 24 shooting, including two federal convictions in this court. Lee Dec. Exs. A and B, ¶ 9.

**K.       Gang membership**

Antoine Ford is known to law enforcement as a member of the Ghost Town criminal gang. Schmarzo Dec. ¶ 26. He has had contacts with law enforcement in Ghost Town territory, where individuals not affiliated with the gang would not be permitted to loiter. *Id.* ¶¶ 27-28. Mr. Ford's street moniker of "Fuzzy" is known to law enforcement. *Id.* ¶ 26. His social media activity indicates his gang membership and includes posts where he pays tribute to the gang and fallen members. *Id.* ¶¶ 29-32.

**III.       ARGUMENT**

**A.       Probable cause supported the issuance of the arrest warrant**

Probable cause for an arrest warrant is "not a high bar" and requires only a "fair probability" that would lead a reasonable person to act. *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090 (2014) (declining to require adversarial procedures to determine the "gateway" of probable cause to indict); *District of Columbia v. Wesby*, 583 U.S. 48, 57, 138 S. Ct. 577 (2018) (probable cause arrest of partygoers); *see also United States v. Lopez*, 482 F.3d 1067, 1078 (9th Cir. 2007) (question is whether there was a "fair probability, given the totality of the circumstances" the defendant committed a crime).

1  The reviewing court examines whether the issuing court, under the totality of circumstances, had a

2  substantial basis for concluding probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.

3  Ct. 2317 (1983).  What is required is a "probability" or "substantial chance" of criminal activity, "not an

4  actual showing" of it. *Wesby*, 138 S. Ct. at 586.  Standards like beyond a reasonable doubt and

5  preponderance of the evidence "have no place" in the issuing court's decision. *Gates*, 462 U.S. at 235.

6  "Probable cause determinations are 'commonsense, practical' questions, and a 'fair probability' is

7  less even than a preponderance of the evidence." *United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir.

8  2015) (quoting *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)).  Courts also

9  recognize that those preparing affidavits operate in the "midst and haste" of investigation, are not

10  lawyers or judges, and cannot be expected to stay abreast of every new explication of probable cause by

11  the courts.  *Id*.  For this reason, the inquiry focuses on the "nontechnical, common sense judgments of

12  laymen." *Id*. at 235-36.  Probable cause determinations may be based in part on reasonable inferences,

13  *id*. at 240 (magistrate may "draw such reasonable inferences" as she will from the application materials),

14  or hearsay statements, *Gates*, *id*. at 238; *United States v. Castillo*, 866 F.2d 1071, 1077 (9th Cir. 1988).

15  The reviewing court should give the issuing court's determination "great deference" and reverse only if

16  it is clearly erroneous.  *Gates*, 462 U.S. at 236 (citation and quotation omitted); *Castillo*, 866 F.2d at

17  1076 (9th Cir. 1988) (citations omitted).  The court's review is limited to the supporting affidavit.

18  *United States v. Stanert*, 762 F.2d 775, 778, *amended and reh'g denied*, (9th Cir. 1985).

19       1.       **Under the totality of the circumstances, the affidavit provided a substantial basis for the issuing judge to find probable cause to arrest Mr. Ford**

20

21       The totality of the circumstances described in the affidavit established the fair probability that

22  Mr. Ford illegally possessed a firearm and assaulted Mr. Hairston with a deadly weapon in the shooting.

23  Multiple people identified Mr. Ford from video and photographic evidence.  The affidavit described a

24  set of facts that met the low bar of establishing probable cause to arrest Mr. Ford, including:

25   • the security video from Brockhurst Street showed a male shooting a firearm in the direction of
        another male from the driver's side front seat of an Infiniti sedan;

26

27   • investigators obtained security video from a nearby hospital showing the driver's seat shooter

28

1    bringing one of the shooting victims to the hospital for treatment;

2    • three Oakland police officers identified the male in the hospital video as Mr. Ford;

3    • one officer stated Mr. Ford was a Ghost Town gang member and shared his booking photo;

4    • a civilian witness recognized Mr. Ford from his DMV photo but did not remember his name;

5    • the civilian later reviewed the hospital video and ruled out another individual named T.J.;

6    • when shown a second version of the hospital video, the civilian witness stated that the male was

7       known by the street name "Fuzzy" and described him as walking with a limp;

8    • Detective Baker knew that "Fuzzy" is Mr. Ford's street name;

9    • Mr. Ford sustained four previous state law convictions including a conviction for violating

10      Penal Code section 12021(a), which prohibited him from possessing a firearm; and as noted,

11   • Per Detective Baker, the security video from Summit Hospital showed the same male dropping

12      off Mr. Wright at the hospital as was depicted in the Brockhurst video.

13   Detective Baker's affidavit explained the provenance of the two security videos, the quality of each,

14   and the surrounding circumstances of the collection and review of the two sets of video, and described

15   the other photographic evidence used to both identify Mr. Ford and eliminate other potential suspects, as

16   part of his description of the facts supporting the requested warrant.  The arrest warrant application

17   listed two crimes: (1) violation of Penal Code section 245(a)(2) – assault with a firearm and (2) Penal

18   Code section 29800(a)(1) – felon in possession of a firearm, but did not accuse Mr. Ford of murder,

19   contrary to the thrust of the motion's argument.  The affidavit provided ample factual support for the

20   reviewing judge to conclude that probable cause existed for both assault with a deadly weapon and felon

21   in possession of a firearm.  A civilian plus four officers provided facts that, when taken together under

22   the totality of the circumstances, identified Mr. Ford as the individual using a firearm to shoot at Mr.

23   Hairston.  Given Mr. Ford's act of shooting at Hairston, there was probable cause to conclude he

24   committed an assault with that firearm.  Given his prior felony convictions, Mr. Ford could not legally

25   possess the firearm, as the motion appropriately concedes.  Motion at 4:1.

26   Under the totality of the circumstances, there was more than a fair probability that Mr. Ford was

27   involved in criminal conduct.  The court should give great deference to the finding of probable cause to

28

arrest and deny the motion.

### 2. The defense claims the affidavit failed to account for defenses and omitted information that would have supported those defenses, but this argument fails under controlling probable cause principles

First, the defense complains that the affidavit failed to account for Mr. Ford's potential defenses to the charge of murder or assault with a deadly weapon miss the mark. But probable cause is a low bar, and it does not require officers to "rule out" the suspect's innocent explanations. *Wesby*, 583 U.S. at 68 ("[I]nnocent explanations—even uncontradicted ones—do not have any automatic, probable-cause-vitiating effect"); *O'Doan v. Sanford*, 991 F.3d 1027, 1043 (9th Cir. 2021) (finding officers not required to credit the defendant's explanation for his conduct); *cf. Illinois v. Wardlow*, 538 U.S. 119, 126, 120 S. Ct. 673 (2000) (Fourth Amendment's concept of probable cause contemplates risk that some arrestees "may turn out to be innocent"). All that is required is a showing sufficient to establish a probability or substantial chance of criminal activity; familiar proof standards applicable at other stages are not used in this analysis. *Wesby*, 138 S. Ct. at 586; *Gates*, 462 U.S. at 235; *Flores*, 802 F.3d at 1044 (fair probability is less than preponderance of the evidence). The case law is firmly against this argument, but in addition, Mr. Ford's anticipated defense would fail because he continued to shoot Mr. Hairston after he turned and was running away, as shown in the image below, taken from Exhibit C to the



1    motion:

2          Moreover, even assuming he had a colorable defense of some kind to the assault with a deadly

3    weapon charge, Mr. Ford was still a six-time convicted felon who could not legally possess (let alone

4    fire) a firearm.  In fact, the motion properly concedes that Mr. Ford "could not lawfully possess a gun."

5    Motion at 4:1.  This also concedes that there was probable cause to arrest for the gun charge.

6          Second, the motion also argues that the affidavit failed to include additional facts.  For example,

7    according to the motion, the affidavit failed to explain when Mr. Ford dropped Mr. Wright off at the

8    hospital, inflating the time interval in the process.  But the exhibits to the motion show that Mr. Ford

9    dropped Mr. Wright off at Summit by 7:16 a.m., and Mr. Wright died at another hospital after 9:00 a.m.

10          Another complaint is that the affidavit did not explain if Det. Baker had ever seen Mr. Ford in

11   person, and the affidavit failed to explain what identifying features supported Det. Baker's statement

12   that the same man in the Brockhurst video dropped Mr. Wright off at Summit Hospital.  The motion

13   posits that the still images from the hospital video were of poor quality because a R.H. told officers he

14   could not be sure who was shown in them.  The motion further argues that the three officers who

15   identified Mr. Ford from the stills failed to explain the basis of their identification, and similarly, the

16   affidavit did not explain how Det. Baker and R.H. knew that Mr. Ford used the street moniker "Fuzzy."

17   Finally, the motion argues that the affidavit failed to describe R.H.'s basis for knowing Mr. Ford's street

18   nickname.  All of these are potential cross-examination points at trial, where the prosecution would be

19   required to establish guilt beyond a reasonable doubt.  But the case law disagrees.  The low bar of

20   probable cause does not require the exacting certainty framed by the motion.  Three officers making

21   identification of Mr. Ford from the images, plus the confirmation by R.H. of the known street moniker,

22   and Det. Baker's assessment that Mr. Ford was the same person in the Brockhurst video and the hospital

23   video are more than enough to meet the fair probability standard for issuance of the arrest warrant.

24   These were facts provided to the issuing court and they conveyed a fair probability under the totality of

25   the circumstances that Mr. Ford shot Mr. Hairston at the crime scene.

26          Defendant's case law is inapposite.  This case does not involve a failure to disclose an informer's

27   tip.  *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 (1971) (undisclosed tip was sole

28

1   factual basis for the charge).  By contrast, Det. Baker described the process by which three officers and a

2   civilian identified Mr. Ford by name and street moniker.  Nor does this case concern a photo array or

3   concerns about suggestiveness.  *Grant v. City of Long Beach*, 315 F.3d 1081, 1086-1088 (9th Cir. 2002)

4   (flawed array shown to two complainants months after their attack in separate incidents).  Here, Det.

5   Baker used still photos of security video from the hospital after learning that it showed a male assisting

6   another male with gunshot wounds into the hospital, and three officers later identified Mr. Ford as the

7   male providing the assistance with other information confirming that the wounded man was shot on

8   Brockhurst that same morning within a short period of 15 minutes.  This case also does not involve a

9   warrantless arrest for probable cause in the field at a traffic stop, or a consent search.  *United States v.*

10  *Lopez*, 482 F.3d 1067, 1078–79 (9th Cir. 2007) (holding that under the totality of the circumstances

11  officers had probable cause to arrest for one of two offenses, denying suppression).  Rather, this case

12  involves a warranted arrest after multiple persons identified Mr. Ford.  In addition, this case does not

13  concern a search warrant with a vague description of a subject as a heavy set black male.  *United*

14  *States v. Johnson*, No. CR 19-0139 WHA, 2019 WL 6251282, at *2–3 (N.D. Cal. Nov. 22, 2019) (court

15  stated video did not show man's face or unique features, granting suppression in part).  Here, by

16  contrast, multiple witnesses identified Mr. Ford by name and street moniker after reviewing his

17  images, from two videos, one from the shooting scene and a second from the hospital.  Finally, the

18  arrest warrant in this case was not based on an undisclosed informant's tip without any basis for the

19  informant's knowledge or reliability.  *United States v. Artis*, 919 F.3d 1123, 1132 (9th Cir. 2019).  Here,

20  the affidavit explained that who R.H. was, the information he provided, and his relationship to the

21  decedent, his nephew; and the affidavit described the information R.H. provided as the investigation

22  progressed.  All of these facts provided a basis for R.H.'s knowledge and reliability.

23          Under the totality of the circumstances, there was more than a fair probability that Mr. Ford was

24  involved in the charged criminal conduct.  *Gates, supra*; *Wesby, supra*; *Flores*, 802 F.3d 1028 at 1044;

25  *Gourde*, 440 F.3d at 1069.  The court should give great deference to the finding of probable cause to

26  arrest and deny the motion.

27

28
    OPPOSITION TO MOTION
    CR 23-060 HSG                                    14

**B.**   <u>**Probable cause supported the issuance of the four search warrants**</u>

Similar to the discussion of arrest warrants above, a search warrant is supported by probable cause if the issuing judge finds that, "given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.  Again, the question of probable cause to search is a common sense, practical determination of whether probable cause exists to believe that contraband or evidence is located in a particular place.  *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (quoting *Gates*, 462 U.S. at 230).  "Probable cause determinations are 'commonsense, practical' questions, and a 'fair probability' is less even than a preponderance of the evidence." *United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015) (quoting *Gourde*, 440 F.3d at 1069.  The reviewing court defers to the magistrate's finding of probable cause, reversing it only if it is clearly erroneous.  *Castillo*, *supra*.  Additionally, an officer's training and experience can support probable cause.  *See, e.g., United States v. Crews*, 502 F.3d 1130, 1136-37 (9th Cir. 2007) (officer training regarding possession of firearms by those who distribute controlled substances).

For the reasons stated in the previous argument sections, the search warrant was not the fruit of an unlawful arrest warrant.  This argument applies to each of the subsequent warrants, as well.

**1.**   **There was probable cause to issue the Instagram search warrant**

**(i)**   **The supporting affidavit showed the account was Mr. Ford's**

Officer Schmarzo informed the court that the account's icon was "of Ford."  This is a publicly-facing photo of Mr. Ford that remains visible.  Schmarzo Dec. ¶ 11.  Officer Schmarzo also informed the court that Mr. Ford's street nickname was "Fuzzy," which tracked the account handle.  These were facts, from which the issuing court could conclude that the Instagram account was Ford's.  *United States v. Wilkins*, 538 F. Supp. 3d 49, 98 (D.D.C. 2021) (probable cause for warrant to search Instagram account based on profile photo and nickname handle).

**(ii)**   **The supporting affidavit showed there was a fair probability that the account contained contraband or evidence of criminal conduct**

This search warrant sought information that could assist investigators in locating Mr. Ford in

order to place him under arrest for two state offenses – illegal firearm possession and assault with a deadly weapon. Mr. Ford's location on September 24 shooting was also highly relevant. Officer Schmarzo's search warrant affidavit informed the court that another officer identified Mr. Ford as involved in the September 24 shooting, and that there was a warrant for his arrest. Officer Schmarzo further informed the court that he verified the existence of the arrest warrant by querying a law enforcement database. The affidavit explained that an Instagram account will frequently include information such as photos, videos, and other messages that will provide insight into a subject's location. The affidavit further explained that the account will likely hold other forms of location information, such as GPS coordinates, metadata, log files, and subscriber information. Thus, there was more than enough to establish a fair probability that Mr. Ford's Instagram account held evidence of criminal activity, both his location at the time of the September 24 shooting and his recent or current locations. Furthermore, the arrest warrant and the affiant's verification provided the factual basis for a warrant to find Mr. Ford's current location while using his Instagram account. *Gates*, 462 U.S. at 238.

The motion misplaces reliance on *United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013). There, only two facts supported the search warrant affidavit, and neither tied the subject to drug transportation. *Id*. at 1083 (discussing earlier delivery of two crates to drug trafficker and observation of marijuana during protective sweep at a different location). Furthermore, the court also considered whether a state search warrant that incorporated a prior federal search warrant (again, for a different location) established probable cause for the search in question. The state affiant presented the content of the federal search warrant but without attribution, and several of the assertions were conclusory. For example, the affidavit referred to but did not describe surveillance observations including the who, when, where and what said of the surveillance. The surveillance observations reference was insufficient to establish probable cause for the state search warrant. *Id*. at 1084. For the reasons discussed herein, the affidavits in this case established independent factual bases for each warrant.

### (iii)  The Instagram warrant was not overbroad

The motion also argues the Instagram warrant was overbroad. Here, the warrant sought records from one person's account – Mr. Ford's – and authorized seizure only of evidence of his

1   involvement in a specific assault with a deadly weapon and his location during a sixty day historical

2   period as well as his prospective location for thirty days. *United States v. Flores*, 802 F.3d 1028, 1044–

3   46 (9th Cir. 2015) (rejecting overbreadth claim for Facebook search warrant for individual account to

4   seize evidence of specified crimes).  At the time of this search warrant, investigators identified Mr.

5   Ford as armed, having used a firearm on September 24 despite his criminal record, and at an

6   unknown location, and they sought to execute a warrant for his arrest.  To the extent there was any

7   "over-seizing" of his Instagram account data, courts recognize that this is a reality in electronic

8   searching and may be addressed with trial orders excluding specific items of evidence if needed. *Id.*

9   (citations omitted).  In addition, the warrant included limitations on what information could be

10  seized and if there was any over-seizure, it required that any such data be sealed and not reviewed or

11  used without a further court order.  Hansen Ex. E at 341.  This provision, the temporal limitation, and

12  the specificity of the criminal conduct involved protected against any excessive intrusion into Mr.

13  Ford's Instagram account.

14          **(iv)    The submitting officer did not recklessly misrepresent the facts, and
                      the actual facts do not preclude a finding of probable cause.**

15

16          The motion argues that Officer Schmarzo recklessly misrepresented facts in the Instagram search

17  warrant application that left an impression, according to the defense, that Mr. Ford murdered Mr.

18  Wright, and secondly, failed to recite facts that could have supported Mr. Ford's defenses.  The motion

19  further argues that the Court should order an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 54

20  (1978).  A defendant seeking a *Franks* hearing must make "a substantial preliminary showing that (1)

21  the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the

22  affidavit cannot support a finding of probable cause without the allegedly false information." *United*

23  *States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (emphasis added); *see also Franks*, 438 U.S. at

24  155–56.  "[T]he defendant must show by a preponderance of the evidence that the affiant knowingly

25  and intentionally, or with reckless disregard for the truth, made false or misleading statements or

26  omissions in support of the warrant application." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th

27  Cir. 2017).

28

OPPOSITION TO MOTION
CR 23-060 HSG                                    17

1    This standard applies not only to false statements made in the affidavit, but also to allegedly

2 reckless or intentional omissions of facts. *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1992);

3 *United States v. Ippolito*, 774 F.2d 1482, 1486–87, n.1 (9th Cir. 1985); *United States v. Stanert*, 762

4 F.2d 775, 780–81 (9th Cir. 1985).  This is no easy standard to satisfy.  The "inquiry begins with a

5 presumption that an affidavit in support of a search warrant is valid." *United States v. Meek*, 366 F.3d

6 705, 716 (9th Cir. 2004) (citing *Franks*, 438 U.S. at 171).  Although the Fourth Amendment requires

7 that a search warrant be supported by a "truthful" factual showing, it does not require perfection:

8           This does not mean "truthful" in the sense that every fact recited in the
          warrant affidavit is necessarily correct, for probable cause may be founded
9           upon hearsay and upon information received from informants, as well as
          upon information within the affiant's own knowledge that sometimes must
10          be garnered hastily.  But surely it is to be "truthful" in the sense that the
          information put forth is believed or appropriately accepted by the affiant
11          as true.

12 *Franks*, 438 U.S. at 165.  Accordingly, the attack "must be more than conclusory and must be supported

13 by more than a mere desire to cross-examine." *Id.* at 171.  The defendant must make "allegations of

14 *deliberate* falsehood or of reckless disregard for the truth," and support those allegations by an "offer of

15 proof." *Id.* (emphasis added).  The facts misstated or omitted must also be material to a finding of

16 probable cause. *Id.*; *see also United States v. Fowlie*, 24 F.3d 1059, 1066–67 (9th Cir. 1994).  A

17 negligent mistake or omission, alone, does not satisfy the *Franks'* state of mind requirement necessary

18 to trigger an evidentiary hearing. *United States v. Garcia-Cruz*, 978 F.2d 537, 541 (9th Cir. 1992).

19    As to the first argument, the search warrant listed a target offense of assault with a deadly

20 weapon, not murder.  The affidavit stated that Mr. Ford was one of the parties involved in the shooting.

21 It stated that there was an active arrest warrant based on his involvement.  It then listed the state law

22 offenses in the arrest warrant as assault with a deadly weapon and illegal possession of a firearm by a

23 previously convicted felon.[7]  The motion's bald assertion of an impression that Mr. Ford committed a

24 murder is insufficient to carry the defense's burden to show deliberately made recklessly false

25 statements by a preponderance of the evidence.

26 ───────────────

27       [7] The motion makes much of the charges brought against Mr. Hairston but charging him with
murder and Mr. Ford with the two state law offenses described in the warrant holds each accountable for
their respective roles in the fatal shooting.

28 OPPOSITION TO MOTION
CR 23-060 HSG                          18

1    The motion's second argument asserts that Officer Schmarzo omitted facts that could have

2    supported a claim of self-defense or defense of others by Mr. Ford.  This argument fails for the same

3    reasons set forth above.  The affidavit is accurate and establishes probable cause.  Probable cause is a

4    low bar and it does not require officers to "rule out" the suspect's innocent explanations.  *Wesby*, 583

5    U.S. at 68 ("[I]nnocent explanations—even uncontradicted ones—do not have any automatic,

6    probable-cause-vitiating effect"); *O'Doan v. Sanford*, 991 F.3d 1027, 1043 (9th Cir. 2021) (finding

7    officers not required to credit the defendant's explanation for his conduct); *cf. Illinois v. Wardlow*,

8    538 U.S. 119, 126, 120 S. Ct. 673 (2000) (Fourth Amendment's concept of probable cause contemplates

9    risk that some arrestees "may turn out to be innocent").  The defense's federal case is inapposite as it

10   addresses post-conviction relief, not whether probable cause existed.  *Fuller v. Ndoh*, No. 17-cv-03196-

11   YGR, 2018 WL 1174561, at *1 (N.D. Cal. Mar. 6, 2018).  This case is also unlike *Perkins*, which involved

12   an affiant's misleading citation of Canadian government authorities to support his claim of probable

13   cause to search without mentioning the Canadian government's decision to drop charges and other

14   relevant information.  *United States v. Perkins*, 850 F.3d 1109, 1117 (9th Cir. 2017).

15   Moreover, Mr. Ford's anticipated defense fails because he continued to fire his gun at Mr.

16   Hairston after he turned to run away, when any threat posed by Mr. Hairston had already dissipated.

17   Finally, Officer Schmarzo knew additional information about Mr. Ford's connection to the

18   Ghost Town gang that had it been included in the affidavit would have strengthened probable cause

19   because Mr. Ford used the firearm illegally in gang territory.

20          **2.      There was probable cause to issue the T-Mobile warrant**

21   First, for the reasons asserted above, this search warrant was not the unlawful fruits of the arrest

22   and Instagram search warrant.  Second, the affidavit informed the issuing court that when Officer

23   Schmarzo reviewed the Instagram account return, he noted that Mr. Ford provided his phone number

24   (the same number sought in the search warrant).  Given that Mr. Ford was handing out this phone

25   number to his Instagram contacts, the fact that he used a pseudonym does not defeat probable cause.

26   Under the totality of the circumstances, there was a fair probability that the phone number in question

27   was Mr. Ford's.  Put another way, by providing the phone number to others, Mr. Ford established

28

OPPOSITION TO MOTION
CR 23-060 HSG                              19

1   probable cause for a reasonable person to conclude the phone number was his.  For the reasons asserted

2   above, the affidavit provided probable cause to search the phone account for evidence of a crime.  Mr.

3   Ford's use of the phone at or near the time of the shooting would be highly relevant evidence

4   establishing his contacts and location, among other things.  The warrant was not overbroad for the

5   reasons asserted above.  Finally, the affidavit did not misrepresent what happened on September 24 for

6   the same reasons articulated above.

7                  **3.      There was probable cause to issue the residential search warrant**

8          The motion challenges the search warrant for Mr. Ford's apartment on two grounds.  First, the

9   motion argues the search warrant did not provide sufficient facts to establish probable cause.  Second,

10  the motion asserts that officers at the scene misled Mr. Ford and the other occupants about the status of

11  the search warrant.  Neither argument justifies exclusion.

12                  **(i)      The search warrant application established probable cause for the
                             search and seizure of the illegally possessed weapon.**

13

14         Officer Schmarzo informed the issuing judge, among other things, that Mr. Ford was co-head of

15  household for the apartment.  Hansen Ex. H at 251; Lee Dec. Exs. D, E.  The motion does not challenge

16  this fact, nor could it.  In addition, officers observed Mr. Ford at the address on the day of the search as

17  he exited the apartment to move a vehicle before returning inside.  Schmarzo Dec. ¶ 17.  Furthermore,

18  officers knew from cell phone ping data that Mr. Ford tended to be in the vicinity of the apartment at

19  night, consistent with his spending time there.  Lee Dec. F.  Finally, the warrant application disclosed

20  the active arrest warrant for Mr. Ford on two charges involving possession of a firearm.

21         To reiterate, probable cause means a fair probability, not certainty, that the items sought are

22  contraband, fruits, or evidence of crime and that they are now at the location to be searched.  The test for

23  probable cause is totality of circumstances—a "flexible, common-sense standard."  *Gates*, 462 U.S. at

24  235 (probable cause is a "fluid concept" and "does not demand the certainty we associate with formal

25  trials").  A reasonable nexus between the criminal conduct alleged and the location is sufficient for

26  probable cause.  *United States v. Crews*, 502 F.3d 1130, 1136–37 (9th Cir. 2007) (sufficient link between

27  apartment location and felon in possession charge); see *United States v. Chavez–Miranda,* 306 F.3d

28

973, 978 (9th Cir. 2002); *United States v. Pitts,* 6 F.3d 1366, 1369 (9th Cir. 1993). *Grandberry* is inapposite. *United States v. Grandberry,* 730 F.3d 968, 970 (9th Cir. 2013) (warrantless search under parolee's search condition of girlfriend's apartment because no probable cause that defendant lived there). The officers in *Grandberry* did not, among other problems, investigate who was on the lease of that location. *Id*. at 972. This case involves a warranted search of the subject residence, of which Mr. Ford was on the lease as co-head of household.

Given his status on the lease and observations that placed him at the apartment, there was ample probable cause to conclude that the apartment was Mr. Ford's residence. In light of the arrest warrant itself, probable cause existed for a search of Mr. Ford's residence for any illegally possessed firearm and relevant clothing worn by Mr. Ford at the time of the September 24 shooting.

> **(ii)   The officers acted reasonably in calling the occupants out of the apartment and sweeping the apartment to ensure other individuals did not remain inside, and in any case, the officers did not seize any evidence during the sweep.**

First, there is no dispute that officers called Mr. Ford and the other occupants outside to effectuate the arrest, just outside the residence's front door. The officers then entered the apartment to ensure no other persons were inside, and then they froze the scene, meaning they did not allow Mr. Ford and the other occupants to re-enter the apartment.

The officers had authority to make a protective sweep of the apartment. The Ninth Circuit held that officers may constitutionally conduct a "protective sweep of the interior of a house when the defendant had been arrested just outside the door to the house." *United States v. Paopao*, 469 F.3d 760, 765 (9th Cir. 2006) (citations omitted); *United States v. Mackey*, 431 F. App'x 594, 595 (9th Cir. 2011) (unpublished) (quoting *Paopao*, 469 F.3d at 766) (upholding finding of reasonable suspicion in part because officers stood on porch next to two large windows and were vulnerable to attack from within home). Here, the officers' swept the apartment to ascertain whether other persons were present.

The motion fails to identify any evidence seized before the execution of the search warrant. As a factual matter, when they made the protective sweep, officers did not search the bedroom closet area

1   (where they later found the loaded, illegally possessed firearm).  Therefore, even assuming the

2   protective sweep violated Mr. Ford's rights, there is no causation between that activity and the seizure of

3   the firearm in the warranted search.  *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004)

4   ("The exclusionary rule requires a causal connection between the illegal conduct and the evidence

5   sought to be suppressed."); *see United States v. Ankeny*, 502 F.3d 829, 837 (9th Cir. 2007) ("The

6   alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is

7   required to invoke the exclusionary rule."), cited in *United States v. Peoples*, No. 19-CR-00226-RS-13,

8   2023 WL 5279650, at *3 (N.D. Cal. Aug. 16, 2023) (denying suppression motion for lack of causation

9   between potential violations and seizure of evidence).

10          In addition, the protective sweep played no role in the search warrant application itself.

11   Schmarzo Dec. ¶¶ 19-25.  The officers interacted with the occupants after Officer Schmarzo submitted

12   the warrant to his supervisors.  Following supervisor approval, Officer Schmarzo submitted the warrant

13   to the judge at 7:56 p.m.  Between 7:45 p.m. and 7:56 p.m., officers executed the arrest warrant for Mr.

14   Ford just outside the residence, and then swept the inside of the apartment and froze the scene.  The

15   judge signed the warrant at 8:05 p.m.  Thereafter, while executing the warrant at 8:36 p.m., officers

16   found the illegally possessed firearm in a box in an upstairs bedroom closet that had not previously been

17   searched.  Since the search warrant application did not rely on any facts developed during the

18   officers' entrance, there is no causal connection between the freezing of the scene and the issuance

19   of the search warrant, making exclusion of the firearm inappropriate.  *Crawford*, 372 F.3d at 1054.

20          The officers acted reasonably by waiting for the search warrant before conducting the search.

21   The Fourth Amendment did not require the officers to turn a blind eye to any occupant hiding,

22   destroying, or carrying away any evidence including the firearm, just as it does not require an officer "to

23   simply shrug his shoulders and allow a crime to occur or a criminal to escape."  *Adams v. Williams*, 407

24   U.S. 143, 145 (1972); *cf. United States v. Bailey*, 568 U.S. 186 (2013).  The officers did not detain the

25   occupants (other than Mr. Ford, who was arrested), but the Fourth Amendment permits restraint of a

26   suspect from entering the house while seeking the warrant.  *Illinois v. MacArthur*, 531 U.S. 326 (2001).

27          Assuming the officers erred in conducting the sweep of the residence, and assuming they seized

28

OPPOSITION TO MOTION
CR 23-060 HSG                                          22

1    evidence during the sweep (which they did not), they later obtained a search warrant to search the

2    residence for firearms and ammunition, and the inevitable discovery rule would apply.  "The inevitable

3    discovery rule is an exception to '[t]he doctrine requiring courts to suppress evidence as the tainted

4    'fruit' of unlawful governmental conduct.'"  *United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022)

5    (citation omitted).  "It applies if, by 'following routine procedures, the police would inevitably have

6    uncovered the evidence.'"  *Id.* (citation omitted).  The government must prove by a preponderance of the

7    evidence that the information ultimately or inevitably would have been discovered by lawful means.  *See*

8    *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009) (citation omitted).  In other words, the

9    exclusionary rule is inapplicable when there is a "lawful alternative justification" for discovering the

10   evidence.  *Id.* at 719.  In addition, the attenuation doctrine would apply because any taint from the

11   sweep disappeared with the warrant's approval.  *United States v. Garcia*, 974 F.3d 1071, 1076 (9th Cir.

12   2020).  Finally, investigators methodically followed leads using a series of warrants to find Mr. Ford to

13   arrest him and search his residence.  *United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015).

### 4.    There was probable cause for the federal search warrant for T-Mobile information

15

16        After ballistics information tied the Glock seized from Mr. Ford's residence to an additional

17   shooting incident in March 2022, there was probable cause for the federal search warrant for his T-

18   Mobile account.  The historical phone location information was potentially relevant to show Mr. Ford's

19   whereabouts at the time of that earlier shooting.  Agent Smith's description of the September 24

20   shooting was an accurate factual statement of Mr. Ford's involvement in that incident.  The application

21   also included additional information about Mr. Ford's federal arrest and his possession of another loaded

22   handgun.  The warrant requested the temporally restricted period covered by the shootings involving the

23   firearm and its recovery from Mr. Ford's residence.

24        The government incorporates by reference the arguments above regarding probable cause to

25   search the phone account for evidence of a crime, including the relevance of Mr. Ford's use of the phone

26   at or near the time of the March 2022 shooting, among other things, and the arguments above regarding

27   overbreadth.  Finally, the affidavit did not misrepresent the facts about September 24 for the same

28

1    reasons articulated above.  The motion fails to carry the defense's burden to exclude or for a hearing.

2        **C.        The officers relied on the warrants in good faith**

3            Alternatively, the court can deny his motion in full on the basis that the officers relied in good

4    faith on the arrest warrant and four warrants.  *United States v. Leon*, 468 U.S. 897, 925 (1984)

5    (authorizing courts to "turn[] immediately to a consideration of the officers' good faith" without

6    resolving validity of the warrant).  The exclusionary rule is "not an individual right and applies only

7    where it results in appreciable deterrence." *Herring v. United States*, 555 U.S. 135, 140 (2009) (internal

8    markings omitted).  It "does not apply when the police conduct a search in 'objectively reasonable

9    reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229, 238-39 (2011).  In such

10   cases, "[t]he error . . . rests with the issuing magistrate, not the police officer, and punishing the errors of

11   judges is not the office of the exclusionary rule." *Id.* at 238 (internal markings omitted).  The Court has

12   applied that reasoning both where the warrant was allegedly unsupported by probable cause (as in *Leon*,

13   468 U.S. at 903), and where it was found to lack specificity (as in the companion case of *Massachusetts*

14   *v. Sheppard*, 468 U.S. 981, 988-91 (1984)).  Courts of appeal, in turn, have applied *Leon* and *Sheppard*

15   to warrants that were overbroad (see, *e.g.*, *United States v. Maxwell*, 920 F.2d 1028, 1033–34 (D.C. Cir.

16   1990) (good faith applied to overbroad warrant that reached "virtually all of [a party's] business

17   records")); warrants that lacked limiting dates (*see United States v. $92,422.57*, 307 F.3d 137, 152 (3d

18   Cir. 2002) ("absence of limiting dates" did not preclude officers from relying in good faith on warrant);

19   and warrants that lacked particularity (*United States v. Otero*, 563 F.3d 1127, 1134 (10th Cir. 2009)

20   (inspectors reasonably believed there were limitations and they conducted their search accordingly)).

21   While a few narrow exceptions to the *Leon* doctrine exist, none apply here.

22       **D.        During the two post-arrest interviews discussed in the motion, Mr. Ford made
            admissions before he said he had nothing more to say.**

23           **1.        The November 17, 2022 interview by OPD**

24           The motion does not identify any particular statement made by Mr. Ford after he stated he

25   had nothing more to say.  In fact, the relevant statements by Mr. Ford during this interview were made

26   before that point.  Mr. Ford spoke to officers for approximately thirty minutes, and during that time, Mr.

OPPOSITION TO MOTION

1   Ford admitted he was at the scene of the shooting and assisted his friend (Wright) by taking him to the

2   hospital for treatment for gunshot wounds.  In addition, when asked about the firearm recovered at his

3   residence, Mr. Ford exclaimed that he had no firearms possession restrictions since he had not been in

4   prison for several years.  After Mr. Ford stated he had nothing to say about the September 24 shooting,

5   the interviewers asked him about a different incident involving a triple homicide, and Mr. Ford

6   answered their questions.  He admitted being present but denied any culpability.  The motion does not

7   provide the court with sufficient information or argument to address these later statements, which do not

8   appear to be relevant to the pending charges.  The motion should be denied.

9           **2.**      **The February 21, 2023 interview by the FBI**

10         Similarly, the motion fails to identify any relevant statements that Mr. Ford made after invoking

11   his Miranda rights when interviewed by FBI agents.  At one point, Mr. Ford blurted out a statement that

12   he carried a firearm that day for his protection.  The motion should be denied, on this record, although

13   the blurted out statement may be subject to exclusion on a more developed record.

14         **E.**      **Defendant is not entitled to an evidentiary hearing**

15         The court should deny the defense request for an evidentiary hearing.  "An evidentiary hearing

16   on a motion to suppress need be held only when the moving papers allege facts with sufficient

17   definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact

18   exist." *United States v. Howell*, 231 F.3d 615, 620-21 (9th Cir. 2000) (no abuse of discretion in not

19   holding evidentiary hearing when defendant identified "no facts which, if proved, would allow the court

20   to suppress the confession"); *see also United States v. Solorio-Mendoza*, 731 F. App'x 583, 586 (9th Cir.

21   2018) (unpublished) ("To obtain an evidentiary hearing on a motion to suppress, a defendant must

22   establish contested issues of material fact.").  For the reasons asserted throughout, the motion fails to

23   establish a contested issue of material fact.

24                         **IV.**       **CONCLUSION**

25         For the foregoing reasons, the court should deny the motion.

26

27   Dated: November 8, 2023                          Respectfully submitted,

28

1

2

ISMAIL J. RAMSEY
United States Attorney

3
                              _____
                                       /s/

4
JONATHAN U. LEE
Assistant United States Attorney

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION
CR 23-060 HSG                                    26